**UNITED STATES of America, Appellee,**

v.

**Charles L. BUSSEY, Jr., Appellant.**

**No. 90–2112EM.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1991.

Decided Aug. 20, 1991.

Rehearing Denied Sept. 23, 1991.

Charles L. Bussey, Jr., pro se.

Lloyd J. Jordan and Carl W. Bussey, St. Louis, Mo., for appellant.

Steven Holtshouser, argued (Stephen B. Higgins and Steven Holtshouser, on the brief), St. Louis, Mo., for appellee.

Before McMILLIAN and MAGILL, Circuit Judges, and WOODS,* District Judge.

* The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

MAGILL, Circuit Judge.

Charles L. Bussey, Jr., appeals his convictions for filing false tax returns for the years 1981, 1983 and 1984, in violation of 26 U.S.C. § 7206(1); failing to file a tax return for 1982, in violation of 26 U.S.C. § 7203; and filing a false statement with the Department of Housing and Urban Development, in violation of 18 U.S.C. § 1001. Bussey argues that the district court[1] erred in giving a "willful blindness" instruction because such an instruction was not warranted by the evidence; in failing to grant his motion for acquittal on the ground that the evidence was insufficient to convict him; in excluding certain testimony under Fed.R.Evid. 608(b); and in refusing to grant him a new trial on the ground of prosecutorial misconduct. We affirm.

## I.

### A. Background

In 1977, Bussey's father, Charles Bussey, Sr. (Bussey Sr.), who resided in Little Rock, Arkansas, contacted his St. Louis-based son about a potential real estate development project in Little Rock. Because Bussey did not have much experience in such matters, he in turn contacted his friend and former employer, William A. Thomas, an experienced real estate appraiser, developer, and consultant, for assistance. In 1978, Thomas suggested that Bussey, a practicing lawyer, form Eastview Development Company, Inc., to build an apartment complex on the Little Rock property. Bussey Sr. and two of his friends were the sole shareholders and officers of the corporation.

To finance the project, Thomas and Bussey sought a Department of Housing and Urban Development (HUD)-insured mortgage in 1980. That same year Bussey Sr. was elected to the Little Rock city council. After the election, there was some question as to whether Bussey Sr.'s involvement with the Eastview project while serving in an elected position was improper. As a result, Bussey Sr. withdrew from the development company and was replaced by his son. Work continued on the project, with Bussey and Thomas eventually obtaining an option to purchase the Little Rock property.

After receiving the HUD mortgage insurance commitment, Thomas found an outside investor for the Eastview project, J & B Management Company (J & B). On April 1, 1981, Bussey, Thomas and J & B formed the Eastview Terrace Limited Partnership (Partnership), whose purpose was to build and develop the apartment complex. Supp.App. 9, at 2. Bussey and Thomas were the Partnership's sole general partners; each had a one and a half percent interest in the Partnership's capital. J & B was a limited partner. Executed simultaneously with the partnership agreement was a Development Agreement (DA) between Bussey, Thomas, the Partnership, and J & B. *See* Supp.App. 10, at 1. The DA provided that the Partnership would pay the general partners a developer's fee for their services. *Id.* at 15. This sum was to be paid in four annual installments (the guaranteed payments). 2 Tr. at 60. Each installment payment was split in two parts for tax purposes. *Id.* at 65.

In connection with the partnership agreement, Bussey and Thomas verbally agreed that any revenue the Partnership received would go to Bussey and that Thomas would receive only a consulting fee and traveling expenses. These totaled approximately $41,500 for the entire project. 2 Tr. at 49. Bussey and his father agreed that Bussey would pass on part of the payments to Bussey Sr. 8 Tr. at 86–88.

After the initial closing in 1981, J & B gave the Partnership a check for $174,084. The check was deposited in a Little Rock bank account for which Thomas and Bussey were the signatories. Pursuant to the DA, Bussey wrote two checks to himself and Thomas, one for $90,000 and one for $84,084, representing the guaranteed pay-

---

**1.** The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

ment. Both men endorsed the checks and Bussey redeposited them in the Little Rock account.

Mario Toca, a Florida accountant, prepared the Partnership's tax return for 1981. In conjunction with the information return Form 1065, he filled out Schedule K-1s for the partners, which listed each partner's share of the Partnership's income, credits, and deductions.[2] The K-1s for Bussey and Thomas listed the guaranteed payment as income, attributing $87,042 (half of the total payment) to each. Under 26 U.S.C. § 707(c), such guaranteed payments were gross income to Bussey and Thomas and were to be reported on Schedule E of their Form 1040 income tax returns. When Thomas received the K-1, he noticed it was incorrect, because he had agreed to be paid only his consultant fee and expenses. Therefore, he directed his accountant to contact Toca and make the necessary correction.[3] Bussey's K-1 was sent to Bussey Sr.'s Little Rock address, which Bussey had used in the partnership documents. Bussey nevertheless received the K-1, which he did not read, but merely placed in the box in which he kept his financial records. 7 Tr. at 230.

Bussey never reported the 1981 guaranteed payment as income. In 1984, when Bussey had his 1981 personal income tax return prepared, Bussey told the preparer, Irl Steiner, that the Partnership's 1981 K-1, which Steiner had found in Bussey's box, was incorrect because the $87,042 attributed to him had actually gone to the Eastview Development Company, Inc. 3 Tr. at 185.[4] Steiner informed Bussey that if that was the case, the Partnership's return and the K-1s would have to be amended to agree with Bussey's return. Steiner also told Bussey that if the K-1 was not corrected, Bussey would have to pay additional taxes. *Id.* at 188. Bussey's K-1 from the Partnership also indicated a loss from the Partnership. This loss, unlike the guaranteed payment, was included in Bussey's return.

### B. 1982 Return

Bussey traveled to Dallas in 1982 to pick up the second $174,084 installment payment from J & B's lawyer. This payment was deposited in the Partnership's account. Bussey then drafted two checks in the amount of $90,000 and $84,084, endorsed them, signing Thomas' name as well as his own, and redeposited them in the Partnership's account. 2 Tr. at 124.

In 1982 Bussey also worked for Maxxam Consulting Group, managing a minority business development agency contract for Maxxam in St. Louis. For his management services, Maxxam paid Bussey $18,000 that year. 3 Tr. at 260.

Bussey never filed an income tax return for 1982.

### C. 1983 and 1984 Returns

In 1983, Bussey again traveled to Dallas to pick up the $174,084 payment. Bussey gave this check to his father, who deposited it in Bussey Sr.'s personal checking account. Of these funds, $33,000 was used to pay off Bussey's loans. 6 Tr. at 160. The final payment, for $131,292, was sent to Thomas in 1984. Thomas gave it to Bussey, who deposited the check in the Partnership's account, and then wrote two checks on the account, one to his father for $75,000 and one to Eastview's builder for $55,000.

Bussey also omitted any reference to the guaranteed payments in his 1983 and 1984

---

**2.** Generally, partnerships do not pay income tax. Rather, the individual partners are liable for tax on their shares of the partnership income. Therefore, a partnership files a return, Form 1065, only for information purposes. Form 1065 states the partnership's gross income, credits, deductions, and the like, for the taxable year. Schedule K to Form 1065 is a summary schedule that lists all of the partners' shares of the partnership's income, credits, and deductions. Schedule K-1 shows each partner's

individual share. A partnership must include copies of all K-1s with its 1065 return, as well as provide each partner with a copy of his or her K-1.

**3.** Thomas received no more K-1s from the Partnership.

**4.** The development company, however, had ceased to exist in the summer of 1981.

returns. His tax preparer for those years, Angela Evans, had given Bussey tax organizers to facilitate the preparation of the returns. These organizers specifically requested any information concerning partnerships. Bussey did not mention the guaranteed payments in the organizers. He also did not show Evans the Partnership's K–1s and did not inform her of any tax consequences related to the Partnership. 3 Tr. at 325.

### D. False Statement to HUD

Bussey was a beneficiary of the federal government's program to assist low and moderate income families in the purchase of a house. Bussey applied for a HUD subsidy in 1982. The program he applied to required that to be eligible for the subsidy, an applicant had to sell any real estate she or he owned, report all sources of income, and list all assets. 5 Tr. at 158. On his application he listed his employment as the manager of a food service company, Midwest Host, Inc., in which he held an interest. He listed his salary as $22,000 a year. He listed no other sources of income. 5 Tr. at 180. The only bank account he listed was his personal account. Bussey also listed a house as an asset, with the notation that the house was to be sold. Bussey did not list among his assets his interest in the Partnership, his ownership interest in a number of small businesses, his partnership interest in a law firm he had founded in 1981, Bussey & Jordan, or his ownership of a 1982 Datsun 280Z car. As regards sources of income, Bussey did not list the guaranteed payments from the

Partnership or his income from Bussey & Jordan. Based on the information he provided, HUD found that Bussey qualified for the subsidy.

In October 1983, Bussey sought to get his subsidy recertified. In his recertification papers, Bussey indicated that his current income was $22,800, see 5 Tr. at 210, but he failed to report to HUD the $174,084 guaranteed payment from the Partnership or income he received from Maxxam.

### E. Procedural History

In April 1990, Bussey was charged with filing false income tax returns for the years 1981, 1983 and 1984, in violation of 26 U.S.C. § 7206(1)[5]; with failing to file an income tax return for 1982 and 1985, in violation of 26 U.S.C. § 7203[6]; and with making a false statement to HUD, in violation of 18 U.S.C. § 1001.[7] Following a two-week jury trial, Bussey was convicted on all counts except the failure to file a return in 1985. The district court sentenced Bussey to three years' imprisonment on each income tax count and one year on the false statement count, with all sentences to run concurrently. The district court also ordered Bussey to repay the $7,883 housing subsidy he received as a result of his false statement to HUD, and to pay a $150 assessment as well as the costs of the prosecution. Bussey now appeals his convictions to this court.

### II.

#### A. The Willful Blindness Instruction

Bussey's primary argument on appeal is that the district court erred in giving a

---

**5.** 26 U.S.C. § 7206(1) provides:

[Any person who] [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ... or imprisoned not more than three years, or both, together with the costs of prosecution.

**6.** 26 U.S.C. § 7203 provides:

Any person ... required by this title or by regulations made under authority thereof to

make a return ... who willfully fails to ... make such return ... at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ... or imprisoned not more than 1 year, or both, together with the costs of prosecution.

**7.** 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

willful blindness instruction. The instruction permitted the jury to find that Bussey had the requisite intent to commit the crimes if it determined that he had deliberately avoided knowledge of the facts that made his conduct illegal. The instruction read:

> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact.
>
> It is entirely up to you as to whether you find any deliberate closing of the eyes, and the inferences to be drawn form [sic] any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

Instruction 37, App. 1. Bussey argues that the willful blindness instruction, also known as the *Jewell, see United States v. Jewell,* 532 F.2d 697 (9th Cir.) (en banc), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), or "ostrich" instruction, *see United States v. Ramsey,* 785 F.2d 184, 189 (7th Cir.), *cert. denied sub nom. McCreary v. United States,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986), was not justified because there was no evidence that he purposely sought to avoid any knowledge.[8]

■ This court has specifically approved the use of the willful blindness instruction in tax fraud cases. *See United States v. Zimmerman,* 832 F.2d 454, 458 (8th Cir. 1987) (per curiam). As we observed in *United States v. Hiland,* 909 F.2d 1114 (8th Cir.1990), the willful blindness instruction "allows the jury to impute knowledge to [the defendant] of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlight-

enment." *Id.* at 1130 (quotation omitted). *See also Mattingly v. United States,* 924 F.2d 785, 792 (8th Cir.1991) ("[T]he element of knowledge may be inferred from deliberate acts amounting to willful blindness to the existence of fact or acts constituting conscious purpose to avoid enlightenment."). In reviewing a district court's decision to give a willful blindness instruction, we must review the evidence and any reasonable inference from that evidence in the light most favorable to the government. *Hiland,* 909 F.2d at 1131.

### 1. *The § 7206 Convictions*

■ The jury found Bussey guilty of willfully filing false income tax returns for the years 1981, 1983 and 1984. Viewing the evidence in the light most favorable to the government, we believe the district court did not err in submitting a willful blindness instruction to the jury on these charges. Although there is a great deal of evidence supporting the submission of the instruction, we will focus on only one transaction, the guaranteed payments Bussey received in connection with the Eastview project. As an initial matter, we note that Bussey testified at trial that he never read the partnership contract or the DA, or his tax returns for that matter: "Q. And among the documents you did not read include all of these Eastview closing documents, your own tax returns, did not read those. Is that what you're telling the jury? A. Yes, it is." 8 Tr. at 219.

As regards his 1981 tax return, Bussey did not report the Eastview guaranteed payment, even though he knew he had earned and received it:

> Q. At that point in time [1981], with your understanding with Mr. Thomas he was only to receive $41,500 out of those monies, at that point in time, the rest of the money was yours. It was received by you, and it was earned by you at that point in time, wasn't it?
>
> A. Yes.

---

8. Bussey also argues that the instruction permitted the jury to find him guilty based on simple negligence. *See* Bussey's Brief at 19. Because the instruction expressly informed the jury that negligence or mistake did not constitute willfulness or knowledge, this contention is without merit.

8 Tr. at 92. Even though Bussey knew he had received the guaranteed payment, in 1984 he told Steiner that it was not his income because it had been paid to the development corporation that had preceded the Partnership:

Q. And you told [Steiner] that all the money had been paid to the corporation?

A. Well, based on the conversation that he said to me, yes, I did say that.

Q. And, in fact all of the money had not been paid to the corporation, had it? The money had been paid to Charles Bussey, Jr. and William A. Thomas, hadn't it?

A. You're raising a very technical—yes, yes.

Q. Is that where the money was paid?

A. Yes, yes.

8 Tr. at 160. At trial, Bussey was asked about his belief that the Partnership was transferring funds to the development company:

Q. Now, it's your understanding that there was still a development company in operation, and also a partnership?

A. Yes.

Q. Did you make any distinction between the two of them?

A. Well, what I thought was happening, because W.A. Thomas was taking care of the accounting, I thought W.A. Thomas was taking care of the accounting.

. . . .

Q. Were you involved in any way with the books and records for [the Partnership]?

A. No. I thought Bill Thomas was taking care of it. He had selected [an accountant]. I thought [the accountant] was taking care of all of those things. . . .

7 Tr. at 233–34. On cross-examination, the government asked Bussey why he believed that Thomas was taking care of everything:

Q. Mr. Bussey, in 1981, what was your rational basis for believing that Mr. Thomas had these bank records from which he could conduct these analyses that you were depending on him to do?

A. I don't know how to answer the question.

Q. You didn't have one did you?

A. I don't know how to answer the question.

8 Tr. at 111.

The evidence also showed that Steiner, after receiving the 1981 K–1, told Bussey that he should contact the Partnership and that the Partnership's 1065 return and the K–1s should be amended to reflect that the guaranteed payments were going to a corporation. 3 Tr. at 187.[9] Bussey never did this. Nor did Bussey ever inform Steiner that he had an agreement with his father to pass on the guaranteed payments. 8 Tr. at 160. Furthermore, Bussey never asked Steiner or Toca about how to treat the partnership income, even though he did not know what a K–1 was or what it meant, 7 Tr. at 230, and he did not understand anything about partnership taxation. 8 Tr. at 25. Bussey's testimony at trial is illuminating:

Q. Did you believe . . . that you could make money as a general partner, and pass it on to someone else, and not have to report it yourself?

A. . . . I didn't think about the question.

Q. Didn't look into it either?

A. I did not.

8 Tr. at 95. Although Bussey was under no legal duty to contact any accountant or tax expert, his decision not to do so constitutes at least some evidence of deliberate ignorance. *See Hiland*, 909 F.2d at 1131.

With respect to the 1983 and 1984 returns, Bussey again failed to report the guaranteed payments as income. His tax preparer for those years, Angela Evans, provided Bussey with tax organizers to facilitate her preparation of his returns. The organizers expressly requested the taxpayer to provide information about any partnerships. Bussey provided none. 3 Tr. at 324, 330. Neither did he tell Evans anything about the Partnership or show her a

---

**9.** Bussey vehemently contests this point. However, based on our standard of review, we must view this issue in the government's favor.

K–1 for those years. *Id.* at 325, 330–31.[10] Evans testified at trial that had she seen the K–1, she would have asked Bussey about the guaranteed payment and the Partnership. *Id.*

In *United States v. Graham,* 739 F.2d 351 (8th Cir.1984) (per curiam), we affirmed a § 7206(1) conviction based on a willful blindness instruction where the evidence showed that the taxpayer failed to give his accountant all the information relating to the taxpayer's sources of income. The taxpayer defended the failure by contending that the accountant already knew the information. *Id.* at 352. The taxpayer argued that although he may have been negligent because he did not read his tax returns before he signed them, his actions were not willful. *Id.* This court disagreed, and approved the district court's submission of the willful blindness instruction, explaining:

> The substantive justification for the rule is that deliberate ignorance and positive knowledge are equally culpable. The textual justification is that in common understanding one "knows" facts of which he is less than absolutely certain. To act "knowingly," therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, "positive" knowledge is not required.

*Id.* at 353 (quoting *United States v. Jewell,* 532 F.2d 697, 700 (9th Cir.) (en banc), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976)).[11] What is apparent in this case is that Bussey knew the guaranteed payments had income tax consequences but deliberately sought to avoid learning anything about the specifics of those consequences. Bussey directed

Steiner away from the payment in 1981 by telling the accountant the payment went somewhere else. In 1983 and 1984, he did not tell Evans anything at all. Bussey asked no questions, sought no guidance, did no research, all despite his claimed unfamiliarity with partnership taxation. Nor did he read his returns or the contracts he signed. From these actions, or lack thereof, a jury could reasonably infer that Bussey consciously avoided any opportunity to learn what the tax consequences were, and could then infer the requisite willfulness required by the statute. Therefore, based on the evidence adduced at trial, we conclude that the district court properly included an instruction on willful blindness for the § 7206 charges.

### 2. *The § 7203 Conviction*

■ Bussey was also convicted of willfully failing to file an income tax return for the year 1982. We are not sure of the nature of his appeal of this conviction. In the summary of his brief, Bussey claims that the willful blindness instruction, combined with prosecutorial misconduct, "tainted the misdemeanor verdict." Bussey's Brief at 10. However, in his discussion of the willful blindness instruction, Bussey's rather confused brief contains no mention of the misdemeanor conviction. Whatever the nature of Bussey's argument, we do not believe that the jury convicted Bussey based on the willful blindness instruction, for there was ample evidence that he willfully failed to file the 1982 return. In *Cheek v. United States,* —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), the Supreme Court stated: "Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally

---

**10.** Bussey claims that he never received a K–1 for the years 1982–84. The Partnership's 1065 returns indicate that he was sent the K–1s. Based on our standard of review, we resolve this conflict in favor of the government.

**11.** We also approved the willful blindness instruction in *Graham* on the basis that the instructions viewed as a whole required the jury to find that the defendant acted voluntarily and

intentionally, and not because of an accident, mistake or other innocent reason. 739 F.2d at 353. In this case, the jury was similarly instructed: "The word 'willful' as used in [§§ 7203 and 7206] means the deliberate, voluntary and intentional violation of a known legal duty, as distinguished from careless, inadvertent or negligent action." Instruction 50.

violated that duty." 111 S.Ct. at 610. In this case, the government proved that Bussey had a duty to file a 1982 income tax return. It also proved that Bussey knew of this duty, based on his own testimony that in 1984 he had given his financial records for 1982 to Steiner, who was to prepare Bussey's 1982 return.[12] Bussey's knowledge of this duty was also proved by the testimony of an Internal Revenue Service agent who interviewed Bussey in May 1987. During the course of the interview the agent asked Bussey about the status of the 1982 return, and Bussey replied that it had not been filed yet because he had had trouble getting the documents together, and because he was very busy and had not had the time. 6 Tr. at 96.

As regards the final requirement, there was evidence at trial from which the jury could infer that Bussey voluntarily and intentionally violated his duty to file a 1982 return. This evidence includes Bussey's testimony that in 1984 Steiner had refused to accept his 1982 financial records until Bussey had organized them, that he had left the records in his car, and that vandals then broke into the car, poured gasoline on the driver's seat, and set the car on fire. 7 Tr. at 271. Bussey's 1982 records were destroyed in this fire. *Id.* At the May 1987 interview, Bussey admitted not having filed a 1982 return, but mentioned nothing about his records having been destroyed. 6 Tr. at 95. Moreover, in his October 15, 1983, recertification application for the HUD subsidy, Bussey represented that he had filed his 1982 return in August 1983.[13] *See* App. 5, at 3. From this conflicting evidence, a jury could reasonably infer that Bussey intentionally failed to file a 1982 return and then sought to cover up his act. Therefore, because there was evidence from which a jury could conclude that Bussey willfully failed to file a 1982 return, the willful blindness instruction did not improperly taint the misdemeanor conviction. *Cf.*

*Mattingly*, 924 F.2d at 792 ("Furthermore, we believe that even if the jury was mistaken about the role of willful blindness, the record indicates that the jury was presented with sufficient evidence of actual knowledge to find appellant liable, thus making any error harmless.").

Bussey also argues that two recent cases, *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), and *Mattingly v. United States*, 924 F.2d 785 (8th Cir.1991), support his argument that the district court erred in giving a willful blindness instruction. Bussey's reliance on both cases is seriously misplaced. In *Cheek*, the Supreme Court reversed the Seventh Circuit's ruling that "a good-faith misunderstanding of the law or a good-faith belief that one is not violating the law, if it is to negate willfulness, must be objectively reasonable." 111 S.Ct. at 610. *Cheek* did not involve a willful blindness instruction and is therefore irrelevant to Bussey's willful blindness issue on appeal. Also of little help to Bussey is *Mattingly*, wherein this court stated that in tax fraud cases under 26 U.S.C. § 6701, which requires that a defendant who helps a taxpayer prepare a return "know" that the return understates the taxpayer's liability in order to be convicted, a willful blindness instruction would be error if it allowed the jury to use willful blindness as a substitute for knowledge. 924 F.2d at 791–92. Our observation in *Mattingly* was based on the language and legislative history of § 6701, *id.* at 791, neither of which are at issue in this case.

Bussey argues that like § 6701 in *Mattingly*, §§ 7206 and 7203 require actual knowledge. The plain language of the statutes refutes this contention, as did the court in *Mattingly* in discussing the appropriateness of the willful blindness instruction: "Section 7206(2) ... requires *willful* assistance in the commission of direct tax fraud. In that context evidence of willful-

---

12. Steiner disputed Bussey's claim, testifying that Bussey never gave him any records for 1982.

13. It appears that Bussey's law firm filed its 1982 partnership tax return in August 1983.

The HUD form, however, clearly requests the applicant to provide information concerning the applicant's previous year's tax return. Therefore, Bussey cannot convincingly argue that he believed the partnership return was sufficient.

ness and a jury instruction on willfulness is properly before the jury. In contrast, § 6701 at issue in the present case *does not contain the willful language* ... but instead contains the term 'knows.'" *Id.* at 791 (emphasis added). We recognized in *Mattingly* that Congress chose to use "knows" in some criminal tax provisions and the less stringent "willful" in others. *Id.* Apparently Bussey has missed this distinction. Therefore, *Mattingly* does not stand for the proposition that the willful blindness instruction is improper in §§ 7206 and 7203 prosecutions, and Bussey's argument is unavailing.

### 3. *18 U.S.C. § 1001 Conviction*

■ The jury also convicted Bussey of knowingly and willfully making a false statement to HUD. In his brief on this issue, Bussey makes a conclusory statement that the willful blindness instruction tainted his conviction, *see* Bussey's Brief at 19, but he again fails to discuss how the instruction specifically affected the § 1001 charge. We note, however, that the court in *Mattingly* did observe that where a statute requires a defendant to have known a fact, a willful blindness instruction would be improper if it "allowed willful blindness to go beyond an inference of, and act as a substitute for, knowledge." 924 F.2d at 792. Because § 1001 requires knowledge as well as willfulness, we examine the instructions and the evidence to determine whether the jury in this case could have substituted willful blindness for knowledge.

The instructions on this charge required the jury to find that Bussey acted knowingly and willfully, and defined willfully as something "done voluntarily and intentionally, and with the specific intent to do something the law forbids." Instruction 19, 24. Because these instructions clearly emphasized the importance of finding specific intent to violate the law, they did not authorize the substitution of willful blind-

ness for knowledge. *See Mattingly,* 924 F.2d at 792.

The 1983 HUD recertification form requests that the applicant provide information about his or her income as follows:

(1) How much did each person make last year, broken down by where the money came from? (2) How much does each person make right now? (3) How much does each person expect to make in the next 12 months, including raises, overtime, part-time jobs, etc.? You must show all money received, no matter where it comes from.

U.S. Department of Housing and Urban Development, Recertification of Family Income and Composition, Section 235(b) Form, *reprinted in* App. 5, at 3. Because the form was filled out in 1983, Bussey's income in 1982 was to be included. The only income he reported was $22,800 from his law firm. There was evidence at trial, however, that Bussey received substantial income from other sources that year, including $18,000 from Maxxam and the 1982 guaranteed payment of $174,084.

Bussey argues that the Maxxam payment was not income to him because it was actually a reimbursement for his contribution to the start-up of his law firm.[14] In 1981, Bussey had joined with two others in forming the law partnership of Bussey & Jordan. At trial, Bussey's law partner, Lloyd Jordan, testified that they had agreed that the Maxxam funds were income to the firm, and that the funds would be used to reimburse Bussey's $10,000 outlay for the firm's start-up costs. 7 Tr. at 41. The firm did not treat the monies as income, however. Rather, Maxxam sent the checks directly to Bussey, who deposited them into his personal account. 8 Tr. at 156. The firm had no record of the checks, *see* 8 Tr. at 91, and Jordan had no idea how much Bussey was receiving from Maxxam. *See* 8 Tr. at 86–87. Neither the firm nor Bussey reported the $18,000 as income. Both Jordan and Bussey testified that Bussey was never involved in financial affairs

**14.** Bussey makes this argument in his cursory statement of the facts of this case. *See* Bussey's Brief at 7.

of the firm and that he let Jordan take care of everything. 7 Tr. at 67, 261. Bussey testified that he believed the $18,000 was firm money. 8 Tr. at 41. But he also testified that he did not perform legal services for Maxxam and that the firm had no claim to the money Maxxam paid him. 8 Tr. at 156.

In brief, the evidence shows that Bussey received $18,000 from Maxxam for non-legal services, that Bussey got Jordan to agree that these were partnership funds that would be used to reimburse Bussey's $10,000 contribution to the law firm, and that the funds were never reported as income to the firm or to Bussey, but were deposited into Bussey's personal account. From this evidence, and the guaranteed payment evidence discussed above, a jury could reasonably infer that Bussey deliberately never checked to see how the law firm was treating the Maxxam money or how he should treat the guaranteed payments. This inference in turn supports the inference that Bussey knew the $18,000 Maxxam payment was income to him, as was the guaranteed payment discussed above. Therefore, we conclude that the jury did not substitute willful blindness for knowledge in this case, but rather used it appropriately to infer knowledge.

In sum, the district court properly submitted a willful blindness instruction to the jury in this case. Bussey strenuously argues against the propriety of the instruction, contending that he was convicted merely for being negligent and for relying on the advice of his accountants. Bussey misses the point of a willful blindness instruction. As the First Circuit has observed: "The purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps." *United States v. Rothrock*, 806 F.2d 318, 323 (1st Cir.1986). By consciously avoiding discovery of the financial consequences of the guaranteed payments and the Maxxam income, Bussey was able to file false tax returns and a false recertification form, and yet now can argue lack of knowledge. We also note that Bussey defends his activities, or lack thereof, with respect to the guaranteed payments on the grounds that he believed Thomas was taking care of the accounting, that none of the Partnership's accountants contacted him about how the guaranteed payments should be treated, and that Steiner committed accounting malpractice and lied at trial to cover it up. These arguments, however, are irrelevant to the question of whether the evidence supported the district court's submission of the willful blindness instruction. Furthermore, they are simply more evidence of Bussey's general penchant for avoidance. His entire defense on the issue of the guaranteed payments was premised on the failures of others to tell him things or do things for him, specifically Thomas, Steiner and the Partnership's accountants. The jury determined, however, that the responsibility for Bussey's current predicament rests squarely on his own shoulders. We agree.

### B. Sufficiency of the Evidence

Bussey next argues that the evidence at trial was insufficient to allow the jury to find him guilty beyond a reasonable doubt. In evaluating the sufficiency of the evidence supporting a guilty verdict, we review the evidence in the light most favorable to the government and we give the government the benefit of all reasonable inferences. *See, e.g., United States v. Kouba*, 822 F.2d 768, 773 (8th Cir.1987). We believe the evidence and inferences discussed in the foregoing section refute Bussey's contention.

The specific focus of Bussey's argument appears to be that the government did not prove that he took an affirmative act in furtherance of the crimes with which he was charged and thus that the government failed to prove willfulness.[15] It is horn-

---

**15.** Bussey's argument on this issue is as follows: The Appellant maintains that Government did not prove an "affirmative act" of willful conduct. As a result Government failed to prove the essential element of willfulness as a matter of law. The "Jewell" instruction combined with prosecution's failure to prove affirmative willful act conduct allowed the jury

book law that two of the essential elements of a crime are conduct and intent. *See generally* 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.1 (1986) (discussing the premises of criminal law). Bussey seems to have conflated the two separate elements. The conduct for which he was convicted was filing false income tax returns, failing to file a return, and making a false statement to a government agency. The government clearly proved this conduct. As discussed in Part II.A., the government also proved the intent necessary for the various charges, i.e., willfulness (for the §§ 7206 and 7203 charges) and willfulness and knowledge (for the § 1001 charge). Therefore, Bussey's sufficiency argument fails.

### C. Bussey's "Expert" Testimony

■ Bussey next argues that the district court erred in preventing one of his witnesses from testifying.[16] The district court, under Fed.R.Evid. 608(b), excluded the testimony on the ground that Bussey was seeking to impeach the testimony of Irl Steiner, Bussey's 1981 tax preparer and a government witness.[17] We review evidentiary rulings only for abuse of discretion. *See United States v. Shyres*, 898 F.2d 647, 656 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990).

■ At trial, Steiner testified on direct examination that Bussey gave him the Partnership's 1981 K–1; that Bussey told Steiner that the income from the K–1 was not his, but had gone to the corporation; and that Steiner told Bussey that the Partnership's return and the K–1 should be amended and that if the K–1 was not changed, Bussey would have to pay additional taxes. 3 Tr. at 185–88. On cross-examination, Bussey asked Steiner about a checklist prepared by the accountant who reviewed Steiner's 1981 work. Steiner testified that the checklist includes things that still need to be done for the taxpayer. A completed item is initialed or checked off. One of the items on the list for Bussey's return was: "If no amended form 1065 with K–1s was filed for Eastview Terrace we should suggest this to avoid a problem with guaranteed payments." 3 Tr. at 220. Steiner conceded on cross-examination that that item was never checked off. *Id.* He maintained, however, that he had nonetheless discussed the necessary changes with Bussey. *Id.* at 226.

Bussey sought to introduce the testimony of Steven Conway, an accounting expert, making the following offer of proof:

As to the offer of proof, it's my understanding that if Mr. Conway were called concerning the testimony of Mr. Steiner, he would, in fact, tell the jury that there is [sic] standard accounting procedures, which are generally known as clearing the points, which if the procedure were followed in this case by [Steiner's firm] was to have [sic] second person review the accounting notes, the tax return Mr. Steiner prepared for Mr. Bussey, and then prepare a bunch of checklist points.

These points are generally listed on one side of the paper, and with room left on the other side of the paper to check off those points.

It was very clear that Mr. Steiner's testimony that they went through, I think it was six points.

Having checked off five out of those six points, and left one totally blank, which deals directly with the issue of whether Mr. Bussey was told to get an amended K–1.

That note of Mr. Weber's was, in effect, that we should suggest to the client

---

to convict the Appellant based on a negligence or reckless standard which is inconsistent with requirements of the law.
Bussey's Brief at 20.

**16.** The district court did permit the witness to testify on other issues, but Bussey chose not to call him.

**17.** Federal Rule of Evidence 608(b) provides: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness...."

that an amended K–1 be received from Eastview Terrace Limited Partnership.

There was no connotation that that was ever done or checked off by anyone.

And Mr. Conway would testify that that is against accounting procedures and [sic] clear indication that, in fact, such statements as to clearing that point were never done.

8 Tr. at 240–41.

Bussey makes numerous arguments attempting to convince us why the district court erred in excluding Conway's testimony but all fail in light of the straightforward dictates of Rule 608(b).[18] Bussey's offer of proof at trial unquestionably shows that Conway's testimony was intended to show that Steiner did not tell Bussey to get the K–1 amended. By addressing this specific instance of Steiner's conduct, Bussey obviously sought to use Conway to attack Steiner's credibility. Rule 608(b)'s plain language prohibits the use of extrinsic evidence for such purposes.

It is apparent that Bussey had every opportunity to impeach Steiner on cross-examination, and that the jury had to be aware of the conflicting testimony as to whether Steiner told Bussey to get the K–1s amended. The jury apparently resolved that credibility issue against Bussey, however, so he now asks this court to revisit it in the garb of an evidentiary issue on appeal. This we will not do, for the simple reason that the district court properly excluded the testimony based on Bussey's offer of proof.

### D. Prosecutorial Misconduct

Finally, Bussey advances a hodgepodge of arguments in support of the proposition that the district court erred in not granting him a new trial on the basis of prosecutorial misconduct. The grounds for the alleged misconduct include the government's reference to Bussey's transferring the guaranteed payments to his father as a "kickback," the government's misstatement of certain dates, and the government's "vigorous advocacy for a denial of opportunity for Appellant's witness to testify regarding accounting errors made by the Government's witness Irl Steiner and the prosecutor's misdirection of the court on the rules of evidence surrounding the proposed testimony." Bussey's Brief at 42–54. Although the nature of these grounds varies, they all share one feature—none of them constitutes prosecutorial misconduct.

To prove prosecutorial misconduct, an appellant must show that: "(1) the prosecutor's remarks or conduct [were] improper, and (2) such remarks or conduct ... prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial." *United States v. Pierce,* 792 F.2d 740, 742 (8th Cir.1986). None of the grounds Bussey has alleged satisfy both of these requirements. For example, the prosecution's "vigorous advocacy" that Conway's testimony should be excluded under Fed.R.Evid. 608(b) was obviously not improper. Neither was the limited reference to "kickback," in that Bussey headed a development project originally begun by his father and then passed monies from the development to his father. The government's misstatement of certain dates, while improper, appears to have been innocent. Moreover, because of the overwhelming evidence of Bussey's guilt, the misstatements did not deprive Bussey of a fair trial. We do not discuss Bussey's other grounds for the alleged misconduct because they are similarly unavailing.

### III.

Accordingly, we affirm Bussey's convictions.

---

18. We note that in his brief on this issue, Bussey raises arguments for the admission of Conway's testimony that he did not make in his offer of proof, e.g., "The issue herein was not the truthfulness or untruthfulness of Irl Steiner. It was the reasonableness of the Appellant's reliance on the accountant's advice." *See* Bussey's Brief at 34. Not only do we question the accuracy of Bussey's characterization of the issue, but because these arguments were not raised in the offer of proof, we will not consider them here.